Good morning, Your Honors. May it please the Court, my name is James N. Lawler. I am from Ulmuth, Mar & Deutsch, and I represent the Harvard Secured Creditors Liquidation Trust, which is the successor to Harvard Industries. Your Honor, we're here today... Oh, and I'd like to reserve three minutes of rebuttal time, if that's okay. Your Honor, this case arises from the Internal Revenue Service's decision to disallow three deductions under Section 172F of the Internal Revenue Code. To the extent that there's any ambiguity here about how we interpret 172F, to what extent, if any, should the burdens of proof apply? And that is that we assume that the exception to a revenue statute does not apply to a taxpayer unless the taxpayer can establish that he or she is entitled to the deduction or exception by clear and convincing evidence. Should we rely upon that? I know you've got to say, no, we shouldn't rely upon that, but why shouldn't we rely upon that to help us wade through 172A and what is meant by product liability and arising under, why shouldn't we rely upon that to resolve it? Well, Your Honor, the allowance of a deduction, once disallowed by the IRS, the burden of proof shifts to the taxpayer to prove that the deduction falls within the statute. So it's Harvard's burden to prove that the deduction is allowable. By clear and convincing evidence? Yes, Your Honor, but the standard is, in this case, is easier because the only facts put forth were by Harvard, so it's not a factual dispute below. Although the service raises issues with fact-finding, the only evidence in the record were facts put forth by Harvard. So ultimately, it ended up being, with respect to the decisions, really an interpretation of law. You have to clearly show us that the recall from the distributors, that that is not a loss arising out of a contract or a warranty claim, and why shouldn't that same focus apply there? You've got to show us that. I agree, except that the issue with respect to products liability is the interpretation of what is a loss of use, the interpretation of what is relinquished possession under the statute, the definition under 172F4. There's no dispute that there was, in fact, settlement payments made, and there's no dispute that there was a damaged product. All right, well, one thing, trying to back me to several different ways, one of the arguments that the government makes in opposing you is that in interpreting the statute, we need to distinguish between product and property. And it's a bit of a technical nitpicking argument, but it seems to me it has some force. What's wrong with that argument? Well, here's the issue, Your Honor. If you look at the plain language of the statute, and we explain why the plain language in our brief, and I don't want to belabor it, but the issue the service takes with that is they say that the intention, based upon the legislative history, was to limit it to products liability claims that weren't, quote, warranty claims. Right. Okay, the problem is they cite... You agree with that, you just said that... I would agree with that. They cite the East River Steamship Company case, which says that in admiralty cases, we don't accept as a products liability claim a cause of action that is just for damage to the product that was defective. It's just an admiralty law issue. The court looked to, and this is why... Sure, it looked to several different jurisdictions. Right. And I agree. The problem is with what that case says is there is actually several different branches of that law. Some cases do, in fact, hold, and we cite the case, the criminal case we believe is Morris versus, I believe it's Osmos Wood, finishing a case in our brief, wood preserving case in our brief. In Maryland, that would be a products liability case. A defect product that results in our having to recall it and pay damages for it would, in fact, be a products liability case. So our position is that while the service says there is a line of cases that say that would not be products liability, there are a line of cases that say it would be. And how do we reconcile that? And that's my first question, clear and convincing. How do we reconcile that? Well, the answer is, Your Honor, the conference report that they cite in their papers as to why the interpretation that they advance is correct says the IRS has to accept the evolving products liability law that's out there. So... Mr. Law, I may be missing something here, but these just look to me like forgiven accounts receivable because, I forget the name of the company, it's not Harvard itself. Harco. A company called Harco. The manufacturer. Yes, yes, S&F, yes. The manufacturer messes up. They fabricate a piece of hardware with a defect in it. And they're not going to get paid, or they don't get paid, and they simply write off the accounts. Isn't that what this is about? Well, there's two things, Your Honor. Harvard accounted for the warranty claim separately, did not seek a deduction for what its exposure was for warranty claims. It separately calculated what its products claims were based upon the exposure from the product defect itself. And if you accept the... But are you talking about the indemnity provision in the agreement? Is that what you're talking about? No, Your Honor. There is a separate... The exposure that Harvard faced was warranty claims. And if you accept that there's a second branch of law out there that says that a defect to a product itself is, in fact, a product's liability claim, which is what the Morris case says, then there was still exposure separate and apart from the warranty claims for potential product liability lawsuits. Now, the problem we all face in these situations are the code encourages settlement, courts encourage settlement. If you settle before... But you have an internal memo. I don't think it carries the day in terms of our legal analysis, but it may undermine your position. You have your own internal memo. I'm not sure who generated it. Basically looking at these claims as contract claims. Your Honor, they separately accounted for the contract claims of $16 million in separate warranty and contract claims. These claims, while they come from account receivable leases, money entitled for Harvard to collect, they are, in fact, essentially a refund to a customer that we would have otherwise been paid. So it is more of a product's liability portion. Why was it refunded is the issue? You're not going to give money back just because somebody is... Because it was a defective product. And the question is, is that enough to generate a product's liability exposure? And under the Morris line of cases, it would be. Even though it was defective at the time you had it. That's correct. That's something that injured property. Assuming the property can be both themselves, and I'm not certain that it can be. They may have some legs to the argument about property versus product. Assume they're wrong about that. If the defect that causes a loss is in the property or product, whatever you call it, at the time that your client possesses it, before they transfer it to the distributor, you're saying that is not also the operation of 172F4? It does not, because under the Morris line of cases, that would still generate a product's liability exposure to Harvard once put in the stream of commerce. We sold the nuts to our distributors. In the stream of commerce, now we have a defective product that we risk exposure for because of the defect. It didn't cause any loss of the use of property to the customer, did it? Sure. The distributors were no longer able to distribute once the defect was determined. They could no longer sell the nuts. What happened was the nut was used in a plane and someone died in a plane crash because of the defect. You can't tie that crash to these nuts, though. No, that actually was determined by the Department of Defense that it is these nuts. If I'm following your, what seems in the nature of a causation argument then, the loss we're talking about is the loss of use of the product. Where has that been quantified in this case? That is what was quantified by the $3.9 million in payments and account receivable forgiveness. How does account receivable forgiveness quantify to whatever the loss of use of the product to the customers would be? That's your client's loss. When you pull out, when you pull back- It sounds like pure economic loss to me. Your Honor, and that's what the East River Steamship case says. What about East River Steamship? East River Steamship says economic loss alone in an amnesty case does not generate a products liability claim. No question. The Morris case says it can, in fact, generate a products liability claim. There's a split of authority and it depends on what jurisdiction you're going to ultimately end up in if you were sued. If I was sued in Maryland, I'd have a different result than if I was sued under an amnesty law case. Now our viewpoint is that the exposure is unknown because you ultimately settle these cases in advance. Your Honor, I'd like to turn to the pension case, the pension payments. Frankly, they're easier if you look at the statute. 172 F1B1- Somewhere in the 172- Somewhere. It specifically says that if you have a specified liability loss arising out of a federal, enforcement of a federal law, application of a federal law, you're entitled to a deduction if it meets the other requirements, that you're an accrual taxpayer and that the liability was incurred or the act or omission that led to the liability took place more than three years before the beginning of the tax year in question. Yeah, it says what enforcement, and I'll ask counsel for the government is to, I'm just assuming that you're making your minimum payments to the fund, but the fund is still underfunded for the reasons arising in this case, what enforcement? The PBGC has many enforcement mechanisms. One is under 412, they can put a lien on all the assets of the company for any liability in excess of a million dollars. But isn't the lien only arises after the 60th day of non-payment of the minimum you're supposed to make? Is that right? Yes, you would. Well, no, actually the provision, it says that upon, remember the actuarial error had occurred three or four years before the settlement. This is a bit of a sidetrack, right? Yeah. You threw me with the actuarial error argument because the way you're coaching your argument, it sounds as though this pension was underfunded because of a mistake in the calculations, your actuarial calculations. But that's, actuarial calculations are just a mathematical, a statistical approach to trying to figure out at a point in time what your liability is going to be. In fact, some years it's going to be over that, some years it's going to be under that. But to take a snapshot of a year where the statistical generalization missed because your funding was too low doesn't mean that your actuarial error is too low. That's not what happened here, Your Honor. And that would be right if, there was actually an error on Harvard. They made a mistake when they determined what the funding requirement was. The calculation itself was wrong. Calculation itself was wrong. That's what the record shows. And they in fact made a mistake to the tune of at least $24 million. And once they had made that mistake, they triggered the additional funding requirements of ERISA. Now, the PBGC could have terminated the pension. Once there's a substantial underfunding, they have the right to seek to terminate the pension, which creates additional liabilities on top of the underfunding. They have the right to assert a lien. There's other rights. They filed a proof of claim in the bankruptcy case. As I understand it, they didn't do any of those things. In the first bankruptcy, there was an issue about how the company was going to become adequately funded to survive. And $100 million worth of notes were going to be issued. In order to issue those $100 million of notes, I think this is what happened, the PBGC was concerned that you wouldn't be able to remain viable financially with that kind of a debt service given the problem that you had with the funding. So you enter into an agreement to pay up front a chunk of money and then pay an additional amount of money on a monthly basis. Is that basically what happened? What happened, yes. The PBGC filed a proof of claim in 1991. So then why doesn't the payment to the fund arise out of that agreement? Because that is the codification of the deal that was struck. The actual act took place, the mistake, the error, when you look at the case law, the InterMet case and the Host-Marriott case, which we cite in our papers, it's when you make the mistake that triggers the statute.  I'm talking about just whether or not, as a matter of law, the agreement, the obligation to pay the $6 million plus the monthly installments after that arises out of the agreement with the pension folks or whether or not it arises under federal or state law. I believe that it arose out of the requirements of 412 of ERISA. Under fund, you have an obligation to meet that obligation. Once you establish a pension plan, you have to live by the rules of ERISA and when you fail to live by the rules, you've created a liability. What the settlement does is merely codify when the payment's made. Once the actuarial error occurred, before the error is liquidated, there is a liability on the part of the company to bring the funds up to date. Is there not? An inchoate? Yes, Judge Weiss, what happens is under 412, you trigger an additional funding liability at that point in time. If they had paid this back in the 80s, it would have been deductible? Yes. At the time it was paid, it was a normal pension payment, it would have been deductible under 162, I believe. All right. The reason that the government is not allowing your deduction is because you waited too long or the fact that the amount was not set until you reached an agreement with ERISA? No, actually what the IRS argues is that regardless of whether we were obligated to make that payment, it was a voluntary settlement in 1994. It wasn't a requirement of ERISA. It was a voluntary agreement to pay the $6 million in that tax year. I suppose your argument is it wasn't voluntary because that liability had been lingering there for years and years and you finally decided to pay it in the 90s. Correct, Your Honor. I'm not sure you'd agree with the wording of the question, but yes, the debtor did not, Harvard did not dispute it owed the obligation. It paid it over time and reached the settlement at a later point, but there was never a dispute that there was an obligation. Anything else, Judge White? Can you reserve some time for me? Yes. Thank you, Your Honors. I understand we haven't gotten through all the arguments. I understand. Thank you. May it please the Court. I'm Rachel Wollitzer representing the Appellee of the United States. The trust glosses over the nature of the distributor credits and payments. They were made to, the payments and credits were made to distributors, not end users of the defective products. What difference would it make whether it was end users or the distributors? Because as far as the distributor was concerned, that was the use that the distributor was going to make of the note and pass it on to the end user, or sell it to the end user. Well, Your Honor, according to the language of the statute, it requires a use of the product. And the definition of use is the purpose for which the product was adapted. The purpose of the defective lock nuts was to function as a fastener in aircraft. So if there were no middlemen here and they had gone directly to the manufacturers, then you're saying there'd be no problem with the 10-year carryback? Well, no, Your Honor. If there had been actual damage, which is what the statute requires. The statute requires damage, and the loss of use is just an incident of that damage. So, for example. Damage, well, I guess that's where you're going, but you mean damage to the, help me with this product versus property, because you're suggesting it has to be damage to something other than the item which gives rise to the liability, if you will, and of itself. It's got to hurt something else. Right. And can you derive that from the text, directly from the text of the statute? Yes, Your Honor. And I'd actually like to mention a point that Judge McKee had brought up earlier, which was that certain rules of construction apply, long-standing rules of construction apply to the interpretation of the statute. First of all, that a deduction is a matter of legislative grace and is strictly and narrowly construed against the taxpayer. Secondly, that under the 16th Amendment, or ever since the 16th Amendment was adopted, the income tax is computed on an annual basis. So you get your income, you get your deductions, it's computed annually. So the 10-year, the loss carryback rules are an exception to that and are narrowly construed. In addition, the 10-year loss carryback that the taxpayers are seeking to benefit from is an exception to the three-year general loss carryback rule. So all of those rules of construction would favor a narrow construction of the statute. So our position is there is no ambiguity in the statute. When you look at the plain language, a payment to a distributor essentially refers to... Walk us through that plain language. Okay. Thank you, Your Honor. The liability for damages on account of physical injury or emotional harm to individuals or damage to or loss of the use of property on account of any defect in any product which is manufactured by the taxpayer. I'd like to focus first on the use of the word product and as distinct from the use of the word property. The word product is mentioned two times in the relevant language and it is distinguishable from property. The word property is only used in the phrase loss of the use of property. So that's distinguishable from the defective product itself. The language does not say loss of use of product and other property. But even if the product was considered property, there would be an additional problem which would be focusing on the word use. And as we stated in our brief, the dictionary definition of use is the application or employment of a thing for the purpose for which it is adapted as distinguished from a possession and employment that is merely temporary or occasional. The purpose for which the lock nut was adapted was to function as an aircraft part. The sale of the product is not the purpose of the product. The purpose of the product is to fast an aircraft. The other argument might be a lot stronger. It seems to me insofar as the revenue sectors are concerned, what does it matter in terms of the company's loss? Whether or not it was a product's liability loss. Whether or not they sold it directly to the manufacturer or whether for whatever reason that got manufactured through a distributor. What difference would that make under the revenue laws? How do we view that? Well, because the problem is that the parts were never installed in aircraft, so the parts never resulted in any damage. There was just a loss of ability to resell. The fact that the plaintiffs were middlemen, the distributors were middlemen, means that they weren't going to be using the parts. They weren't going to be installing the parts in aircraft. So there could not have been any loss of use of the property of the product. Ms. Willis, let me take you back to the text. I believe that Harvard has suggested certainly that the statute is not as clear as you maintain it is, but I think they mentioned that if Congress really, I mean, if property was meant here to refer only to property other than the product itself, then what Congress would have said is other property. What do you make of that argument? Your Honor, I think that the distinctions, the use of the terms product and property makes clear that distinction. By the same token, you could say they didn't say it's a loss. So other would become redundant according to your position? Yes, correct, Your Honor, because one- We've got product here that's one conceptual entity, and we've got property here that's another conceptual entity. Correct. And against the background of products liability law, which under East River, you do need damage to other property. Even damage to the defective product itself caused by the defect isn't enough. You need damage to other property. And I would also like to point out that East River was a Supreme Court case that explicitly incorporated common law products liability law. So the majority rule, as recognized by the Supreme Court in East River, is that damage to other property is required. And this is confirmed by the Conference Committee Report and the Joint Committee on Taxation Report and the regulations. The Conference Committee Report states that the product liability does not include liabilities arising under warranty, which are essentially are contract liabilities. And that is what the payments in this case were. As Judge Smith recognized, it was basically just a writing off of the amounts owed for the products. It was a credit, a forgiveness of the accounts receivable, essentially a refund. They hadn't paid for the products yet, so instead of giving them a refund of what they  And similar with the HARCO payment, which was a settlement payment, not just a forgiveness of account receivable. This was in settlement, again, of contract liabilities, of what HARCO had paid for the defective product. And in fact, the HARCO agreement explicitly excludes third-party claims. So if the product, if the parts had been installed in planes, and there had been a crash, any claims of those injured plaintiffs would have been excluded under the HARCO agreement, which further clarifies that the HARCO payment was purely a contractor warranty claim saying that What's in an indemnification agreement is of no use to us in terms of construing the statute, interpreting the statute. Well, because it just makes clear that really what these payments and credits stand for is giving the distributors the benefit of their bargain. So they contracted for properly manufactured It may be evidence of what the parties think the statute means, but it's not anything that is helpful to us in some sort of four corners interpretation of this section of the statute. That's my report. Correct, Your Honor. It just shows how the statute applies in this situation. And the meaning of the statute is further clarified by the conference report, the joint committee report, which explicitly says that damages to other property or persons attributable to a defective product may be product liability losses. Is that the only report from Congress we have on this? We've had some bad luck this morning. There are no inconsistent reports, Your Honor. The conference report is fully consistent with the joint committee report, which is fully consistent with the regulations. You've still got some time left. I really want to get to it, but at least to my mind, it's the much more difficult issue of the ERISA payments. Yes, Your Honor. Now, again, our position is that because the obligation undertaken by the taxpayer was a voluntary obligation entered into as part of an agreement, it was a choice of the taxpayer and not an obligation arising under the law. It may have been a choice in terms of how it was implemented, but didn't the underlying obligation, they had an obligation, didn't they, to adequately fund the pension plan? Yes, Your Honor. What was the source of that obligation? Well, the agreement specifically stated that the taxpayer was entirely... Oh, excuse me, Your Honor. Judge Weiss? Well, the agreement said, what's the source of the obligations, is what Judge McKee is asking. Yes, Your Honor. But the agreement specifically stated... No, Judge Weiss is asking you. Forget the agreement. Oh, I'm sorry, but it's an evidential... Well, it's essentially an admission in the agreement that the taxpayer was entirely current on all of its minimum funding obligations, and that's the key point. Because the only liability that there is... No, that's not the key point. The key point is that there was obligation over and above the minimum amount, and that's what they want to deduct, is it not? Correct, Your Honor. And the taxpayer has constructed this terminology that it calls additional funding obligations. Okay, but don't forget the terminology. And I know we keep interrupting, and we will let you guys through this, but Judge Weiss just asked you a question. You said correct. They had obligations beyond the minimum funding obligations. That's correct. Correct. But those were... And those obligations is what got them to the agreement with the PVGC? No, Your Honor. Because the unfunded benefit liabilities are amortized into the minimum funding contributions. So, there are no additional liabilities. Okay, but I thought you just said they did have additional obligations, which are now no additional liabilities. Which were amortized into their current minimum funding contributions, and they were current on those at the time the agreement was entered into. So, there was no lien? There was no lien, because they were not behind on their payments. They were completely current on their payments. Yes, Your Honor. Now, in the 1980s, when the actual area could have been discovered, and the company made up the difference between the current funds and those that should have been there to be completely funded, would not that have been an obligation of the company? Yes, Your Honor. And by the time the agreement was entered into, they were current on all those liabilities. They had made all... They had paid, what was the $6 million for then? Because of the, what Judge McKee described earlier, because of these actuarial, because of these changing... Well, that's what I was talking about too, the actuarial things. Had they been discovered in the 80s, would have shown that the company owed additional money to bring the funds up to the level they should have been. Your Honor, I would like to take issue with the trust statement that there were errors, other than just this notion that they're changing variables and the assumptions can change. Well, let's assume that they are, because otherwise the whole thing goes away. Well, Your Honor, I do take exception with that, because they didn't identify any specific errors. Under the statute, there has to be a specific act, or failure to act, giving rise to the liability. They haven't identified a specific error. They didn't say, well, they used the wrong interest rate, or they used the wrong actuarial statistic. There is no error identified in the record. So, our position, we disagree with that characterization. Our position is, sometimes the interest rates go up, sometimes they go down. That's why there can be unfunded benefit liabilities one year. There can be an overage the next year. There can be an underage the year after. So, our position is... It's not a grammatical mistake at all. Well, we haven't seen any identified in terms of meeting the requirements of the statute. Well, they really did identify them in the 90s, did we not? In 94? Well, the agreement was entered into in 94, but they're saying that there were... And that set the figure of the unfunded obligation, did it not? Correct. And under the statute, the amount and the existence of the obligation has to be specifically set by the act. Where did the $6 million come from? How did they... I know they agreed to it in the agreement that gave rise to them being able to sell the notes, but I assume they didn't just get out the old Ouija board and say, you know, Ouija board, tell me how much I can agree to sell these notes. Where did it come from? Correct. Well, it was said in the agreement, and it must have been determined by these... The unfunded benefit liabilities. Why was it unfunded? Because of these changes in these actuarial assumptions. Okay. I think we're going to get to who's on second next. May I just... Something gave rise to an obligation that was not fully satisfied, and we're calling it an unfunded pension fund. What was that something that made it underfunded? I say unfunded.  Why was it underfunded? That is not in the record, Your Honor. Either changing interest rates or changes in actuarial assumptions, the economy. The record clearly shows that it was underfunded. It wasn't underfunded long enough for a lien to attach. No enforcement action had been taken, but it was underfunded. Correct. And if the $6 million, if the $24 million had not been required by the agreement, then that amount would have been amortized into their future current minimum funding contributions over the subsequent years. That's important. I'm going to ask your colleague about that. Now, suppose that we disagreed with you, and we thought that the $6 million was properly deducted. Does the taxpayer get any money out of that? I'm sorry. If the court reverses on the pension payment issue? Yes. Is that the question? Yes. Well, if then we would get to the third issue, which is the workers' compensation insurance. Forget. Say you lose the workers' compensation also. The only thing outstanding would then be the $6 million. Yes, Your Honor. Does the taxpayer get any money? I would presume that there would be a refund resulting from that, Your Honor. I can't be entirely sure. It would have to be calculated. But I assume that there would be enough of a deduction to provide for a refund. And I believe my time is up, so. Thank you very much. Just to answer that last question, there would be a refund of approximately $1.4 million plus interest for 10 years or so. Can I ask something? Maybe it will allow me at least to get my handle around this ERISA problem. She said that if there had not been an agreement, then the amount, let's assume, I know there may be an issue about exactly how much the amount may have been because of the upfront payment and then it was spread out. But let's assume that an amount, X, that had you not agreed with the PPGC to pay X, then X would have been amortized out. And you would have gone on making your payments to the pension fund over whatever number of years. But things would have continued as usual. And forget for a second about your desire to sell $100 million for the notes. Put that out of the equation. Assume no agreement. What would have happened to that unfunded liability, underfunded liability? Well, it would have been in the PBGC's discretion to deal with it. It could have terminated the pension, first off, with a significant $24 million unfunded liability, which they filed a proof of claim for in the bankruptcy. They could have sought termination of the pension plan. Well, okay. Instead of saying, you can't amortize, you've got to pay it today. The record is not as clear as I thought. Yeah, it's not. I thought you represented there was a mistake made. We all, I guess, agree that there was some underpayment. We're not sure what it was. From, Ms. Wilson was saying, it may be the usual kind of mistake that leads to, the usual kind of inaccurate calculation, put it that way, that leads to an underfunding. You're saying it wasn't a rise of interest rates or decrease of interest rates or more folks leaving the company or dying off than you had assumed in your actual calculations. It was an actual, I assume it was a mathematical error in your software that led to an underfunding in a certain amount. That's what you're saying? I don't know the specific mistake that was made in 1990 and 91, which is when this happened. But wouldn't it matter? It wouldn't because this is what happened. The PBGC, when it learned of the mistake, filed a $24 plus million claim in the bankruptcy case. They recognized in 1991 there was this existing liability for underfunding. It had several options. It could work a deal where it would take the money over time or it would terminate the pension and take it over, hold other people liable, assert its rights in the bankruptcy case, et cetera. Nobody knows what the Pension Benefit Guarantee Corporation would have done had Harvard not cut a deal. What we do know is they cut a deal to pay it because they owed it, and they paid it over at $6 million initial payment and then $1.5 million over time. You're making it sound like your deal had nothing to do with the desire to issue the $100 million worth of notes. I think it had everything to do with it. Well, I think it had everything to do with the bankruptcy of Harvard the first time around, which is they had to take care of this claim. It existed. I mean, we see it all the time with these large corporations. I mean, what happens when United files bankruptcy? It terminated its pension plan, leaving a huge liability on the United States government to take care of it. So that's what was facing Harvard at this point in time, and the deal that was cut was they would pay it over time. But they paid the first payment, $6 million, in the tax year in question. Why doesn't it arise under the agreement? I mean, as opposed to the law, the agreement being the choice that was effectuated in order to discharge the – well, if I put it that way, then you win. If you put it that way, then you win. Yeah, and you could – I mean, Your Honor, there is an arbitrariness to some of this because it's a code and you have to pick a point in time to measure. What's the triggering event? Well, you could argue that it was a settlement, although the PBGC had already filed a proof of claim in 1991 for the same amount of money. So you could argue it was in 1991 they filed the proof of claim, or you could argue when it was the actuarial error. If you look at the case law, House, Marriott, and InterMed, I think, are the best cases on this. It's like when you file your tax return. If you make a mistake on your tax return in 1991 and you've got to pay interest because you go back and amend your return in 1995, the interest is deductible as it relates back to 1991 under the statute because that's when the mistake happened. It happened in 1991. It didn't happen in 1995. You just found out about it, but you're liable from 1991. Yeah, the problem with InterMed in those kinds of cases is it's a different kind of obligation that can currently be traced to the obligation in the code. It's interest. Yeah, but there was a specific statute that said you have to pay the interest. In this case. In the amount. You're right, but in this case, Your Honor, you have Section 412 of ERISA that says you have the obligation. The PBGC determines the obligation, and you can fight about it, or you can acknowledge you owe it. Have the obligation, which is what? What is the obligation that arises there? The obligation is to meet the additional funding requirement under 412L8. The additional funding is a minimum funding that you have to pay. It means you're underfunded. It's not a minimum funding requirement. It means you're underfunded. But as long as you make your minimum funding payments, the PBGC cannot take any legal action against you. That's not true. It's not true. That's not true. If you're underfunded, the PBGC still has the right to terminate. Even if you're current in your minimum funding requirements, they can still terminate the plan if it's underfunded. Judge Weiss, anything else? Yes. I'm curious about the fact that if we allow the $6 million deduction, that you would still be entitled to $1 million something. Can we find in the record where that computation was made? Good question, where in the record. Because of the way the procedural posture of this case kind of came up in two pieces, the PBGC piece was decided separately from the workers' comp piece. In the record, there is, I believe, a certified record from the service as to what the amount of tax was that was paid in 1986, I think, that we're seeking the return of, the refund of. And that number is fixed. I believe it's $1.4 million at this point, based on other deductions that were allowed. They paid, I think, $6 million in tax. And then, yes, I'm sorry. Was there another set off later on where the code determined that they had allowed deductions which should be set off against this? Yes, and this is the workers' comp piece. In the event that the workers' compensation decision by Judge Brown is reversed by this court, there would be a credit, there would be an overpayment by the service on a prior refund. And they would be able to offset to, I think, it would probably, it's a $2 million deduction, two-thirds of which should have been allowed. It would probably have to go back to the trial court just to figure out the numbers. There would still be a significant refund, regardless. Okay. Thank you.  We'll take the matter under review. Thank you. Thank you.